We will hear argument first this morning in Case 23-A-349, Ohio v. Environmental Protection Agency and the Consolidated Cases. Ms. Shee, refer one. Mr. Chief Justice, may it please the Court. The EPA set out to address the contributions of 23 upwind states to downwind air pollution through a single federal plan. But as commenters predicted and before the plan became final, the legal predicates for the federal plan, that is, the state plan disapprovals, came under fire in courts all around the country. The specter of lesser participation in the federal plan revealed yet another problem. The EPA's choice of method, that is, selecting a single cost threshold and applying it uniformly across all 23 states to establish emissions limits, has consequences. Namely, the math doesn't work when the inputs don't match the outputs. With the SIPP disapprovals in flux and the EPA's methodology requiring full participation, the EPA had an obligation to consider what happens to the federal plan when one or more states drop out. That is, when the inputs, 23 states, don't match the outputs, now the 11 states that remain in the plan. Its failure has become consequential. The plan now regulates under half of the states and a quarter of the emissions that the EPA originally set out to regulate. Under this fractured plan and without a stay, the remaining states and their industries face serious harm. I welcome the Court's questions. Well, it seems that your argument is dependent on whether or not the original plan was interdependent and required all the states to be in. What's your best evidence for that? The best evidence for that, Your Honor, is the method that the EPA chose. And the method it chose has to do with discerning points of diminishing marginal returns, which means that when the mix of states changes, in this case when states drop out and their particular technologies and industries drop out with them, those points of diminishing marginal returns shift. And they shift somewhat unpredictably, which means that the relevant cost threshold for a different mix of states could be cheaper. And with full candor to the Court, it could be the same or even be more expensive. The problem is we don't know. It is the unpredictability that renders this plan unreasonable as to any different mix of states. Could you break that down? I don't understand. You started your introduction by saying that the commonality was cost. But I thought that cost had to do with the technology and how much it costs to implement. So I don't see why that would be different among the 50 states or marginally important enough to be different. And to the extent that the other states dropping out don't increase the cost for any of the remaining states. Their allotment remains the same regardless of how many people are participating. So I don't see how you're raising an argument, frankly, not for yourself because nothing's changed. Well, Your Honor, let me take that in reverse, and I'm happy to go down the gritty path of the technical details. But before that, the allotments may not change in the way the EPA has executed the plan, but the allotments themselves are wrong when the EPA fails to consider what happens with lesser participation. Say it, but show me. Sure, Your Honor. The answer goes, again, to the methodology, which I keep calling the point of diminishing marginal returns question. And I'm happy to go step by step into what is admittedly an extremely gritty mathematical problem. Why don't you get to the end question? Nothing is changing in your costs or what you have to do. Meaning the states for whom states have not been given, their allotment doesn't change. Nothing changes. Again, Your Honor, you're talking about the execution of those allocations, but the allocations themselves are now wrong. And what I mean by that is the EPA's method of selecting a single cost threshold. Now, that goes to looking for points on a graph where an additional dollar spent produces little to no additional emissions reduction. Those points on that graph change unpredictably, erratically, when the mix of states changes. Well, I understand that point, but the calculations, the methodology is all there, and I assume you just, instead of putting 23 states in, you put 11 in and looking for whatever reduction. Instead of 100, you do the 11%. How long do you think it would take, if there were a proceeding, to adjust the numbers along the lines that you propose, or at least for EPA to know what those numbers are and determine whether or not that's a sufficient change and it leads to a sufficient change in the result? I don't know how long it will take the EPA to re-crunch the numbers. What I can say is... I think they'd do it real quickly. I'm sure they could, Your Honor, but here is the problem. They fail to consider any of that. This is a failure to consider problem. They fail to consider the most important aspect of the interdependency that they introduced into the program by virtue of using this particular methodology. What's more is, even if there ultimately is no change, and I can't tell you what that looks like, whether there is a difference in the obligations or not, there are at least some examples in the record for the coalition of states that I represent where there could be a cheaper cost threshold, but what matters is the EPA failed to consider at all and has sort of blown past the problems. You're saying, nothing to look here, just go ahead and execute your obligations as they are. To make sure I understand that, I think you're saying, but correct me if I'm wrong, that when the EPA said the whole thing is severable in response to the comments that the SIP disapprovals were going to be problematic and that would unravel the whole plan, when the EPA said, oh, don't worry about it, it will be severable, that that was not adequately explained in terms of how the subset of states would work. Is that what you're saying? That is definitely correct as for a position with respect to the severability provision. That is not just a failure to explain, it just blows past the problem. It is at best boilerplate, and let me give you an example of why that's true. In other words, let me just follow up on that. In other words, the Chief Justice's question, maybe they could do that quickly, maybe it would take them a while, but they didn't do any of that. Yes, that's exactly right, Your Honor. They've done nothing by way of addressing contingency. The argument you're making now, I don't remember that in your application. Can you point me to where in your application I should look to get your argument? Because the way I remember your application, you had a very high level of generality about interdependence and collective responsibility and so forth, but you gave us really nothing to allow us to say, well, how would this have been different if it had been 13 rather than 21? What would have changed? Well, on pages 18 to 21 of our application, we addressed this methodology in admittedly the same broad and capacious terms that the EPA uses in its final rule. Well, it's your burden right now to show a likelihood of success, and I have to say pages 18 to 21, if I took these pages and I compared it to what you're saying now, I don't think that I would find a whole lot of commonality. Well, Your Honor, that brings me to the second reason. I'm here discussing sort of the nitty-gritty of that methodology, and that is to directly answer this court's order and the question of why lesser participation matters. And in order to do that, we have had to plumb the record well past what is in the final rule, deep into the technical support documents that the EPA has. I appreciate that. I mean, we gave you a question, and you're trying to answer the question. I guess it does, though, suggest to me that this is an unusual posture for us to be in. No court has looked at the kinds of questions that you're raising here, the kinds of questions that we asked you to discuss. Not a single court has addressed that issue, and yet here we are on papers that also do not address the issue trying to figure that out. That seems quite odd to me, and I'm wondering how you think we should do that. Well, two reasons or two answers to that, Your Honor. First of all, while these proceedings are going on, the states and their industries continue to suffer irreparable harm. And second, perhaps this would be a different story had the EPA refuted anything with respect to the interdependencies in the plan. They have not said a single word saying that interdependencies do not exist. I will concede that they keep saying, well, you can just plow ahead with your obligations, but they don't explain why those obligations make sense anymore under the methodology that they chose. Counsel, did you raise this interdependence point in the comments? Yes, Your Honor. Commenters did preview the fact that the federal plan and its uniformity would be destroyed by the SIP disapprovals and the litigation surrounding that. I can point to— Sorry, where did that happen? I thought the SIP disapprovals came after the EPA had announced its plan. No, not exactly, Your Honor. The SIP disapprovals are the legal predicate for the EPA's authority to have a federal plan in place. I'm sorry, I misspoke. The rule was promulgated after, before the courts restrained it with respect to some states. Not exactly, again, Your Honor. It is our view that publication in the Federal Register is the point of— Well, why is that? Why wouldn't it be the finality of the rule? Why is publication the date we should look at? Well, a couple of answers to that. With respect to the Clean Air Act itself, it ties publication in the Federal Register to final agency action that is reviewable under the Clean Air Act's judicial review provision. Second, by the EPA's own words in the prepublication notice it presented in March, the EPA noted that that would not be the final rule for the purpose of compliance. And, in fact, that would fail the second prong of this Court's Bennett test because legal consequences did not flow from that. But I also want to take a step back because even if this Court disagrees with me as to whether the states fall into or out of the gambit of what the agency had to consider, the fact that the commenters previewed all of the problems with respect to the SIP disapprovals and cautioned that the Federal Plan's uniformity would falter, and then very quickly afterwards there was confirmation of that through litigation that popped up all around the country before the rule even—the Federal Plan was in a prepublication form, all of that cued the agency into its obligation to address this very serious structural flaw with the Federal Plan. Oh, I'm sorry, you're deaf? So we're here on a motion, your motion for emergency relief, and it's fairly extraordinary, I think, to be asking the Court to decide this matter when you haven't even lost below in terms of what is before the D.C. Circuit. And, in fact, my understanding is that you haven't even briefed this argument yet in the D.C. Circuit. So I'm trying to understand what the emergency is that warrants Supreme Court intervention at this point. At the breakneck speed we're going in order to get into compliance with an unlawful federal rule, we are spending immense sums, both the states as well as our industries, and on top of that we are facing the threat of power shortages and heating shortages, all of which have gone sort of— Imminently? I'm sorry, imminently power shortages and heating shortages? At least some grid operators have pointed to the fact that this federal rule will be directly associated with the potential for grid unreliability. Eventually. We're here on emergency relief, and I guess I'm worried about the standards that this Court needs to take into account when it decides whether or not to entertain these kinds of motions. So what do you perceive your burden to be with respect to showing harm? Shouldn't we be seeking some sort of extraordinary harm, not just the serious harm you say that states will face? Well, on top of that, going back to the compliance burdens, that every dollar that we are spending, and we've spent a lot, and I know Council for Industry is going to stand up and tell you about the millions of dollars— Yes, but everybody who has to comply with a rule has to spend something, I would think, in order to do so. And what I'm a little concerned about is that really your argument is just boiling down to we think we have a meritorious claim, and we don't want to have to follow the law while we're challenging it. And I don't understand why every single person who is challenging a rule doesn't have that same set of circumstances. I think that goes to the immense sums that are spent that are not recoupable. It goes to the fact that the timeline is exceedingly compressed, so the heating shortages we speak of, and if you go to GRUB declaration that the natural gas pipelines have submitted, paragraphs 66 and 67, the harms we're talking about are serious in terms of— No, I understand, but I thought there was something about 2026 when these things have to actually come into effect? Sure, the compliance deadlines might be then, but what it takes to get to compliance starts now. And from the state's perspective, we're the states, we've already started, and we have to start. Have you asked the lower court to expedite its review? I would think that that should be required in a situation like this, since you're saying stay this pending their review, so are they moving quickly at your request? No, we have not, because of the nature of the proceedings before this court. We are seeking a stay of this court because of the harms that we are facing right now, and we believe that we will both succeed on the merits as well as we face a sort of— Thank you, counsel. Justice Thomas? Justice Alito? Justice Sotomayor? You never filed a motion for reconsideration after the rule was announced. The agency can only rely on comments that are made during the public time, not after, which means without a motion for reconsideration, there's no record before the agency proving the interdependency you're claiming right now. Correct? No, Your Honor, there is a record, and it comes from the methodology that the EPA chose and explained well into a technical— But you did not supply a motion for reconsideration in which you laid out what these additional costs would be. We didn't have to, Your Honor. All right. Isn't it an inversion of normal rules when you're seeking expedition to bypass the very court who's going to make the substantive decision and not even ask them to expedite and rush to us on an incomplete record? I don't think so, Your Honor. This is not an incomplete record with the fact that the commenters previewed what's going on and litigation confirmed it very quickly. It is also not an incomplete record with respect to the methodology itself. That methodology, again, goes well deep into the technical support document, in part because the EPA engaged in a sort of capacious way of talking about the methodology, but it's there. And the ozone transport policy analysis goes down to details of how the cost threshold is specific to the mix of states that goes into it. And when that shifts, the EPA has an obligation to assess why it matters or why that cost threshold is still reasonably applied to any remaining states. It has not done so. The burden is on the EPA to consider the inflexibilities that it introduced into the plan. And it has failed to do so. And it continues to stick its head in the sand by failing to go back to the drawing board. Justice Kagan? So in this posture, one of the things that we are supposed to consider is would we take cert on this case and would you be likely to prevail if we did take cert? And one of the reasons usually we don't take cert on the case is if it has a lot of stuff before you get to the merits issues, which is the only thing that we would be concerned about. And it does seem to me you want to term stuff, sometimes referred to as vehicle issues. There are just a lot of them here, right? There's the question of did you have to comment and did you comment? Then there's the question of, well, even if you couldn't comment because you didn't know enough, should you have filed a motion for reconsideration and you didn't file a motion for reconsideration? Then there's this very complex issue about how your question relates to the validity of the SIPDIS approvals themselves. Because if the SIPDIS approvals were valid, you wouldn't have a leg to stand on here. So how are we supposed to know that in this posture? So I guess what I'm saying is there are so many hoops that you have to go through, and you have to go through all of them. You have to run the table before we could even begin to get to your merits question. Isn't that, according to our usual standards, a reason to deny this application? Justice Kagan, you've given a lot of stuff associated with this case, but there's one thing I really want to talk about, which is what happens if the SIPDIS approvals ultimately settle in a place where all 23 states end up staying in the plan? That doesn't change our argument. The problem is the EPA failed to consider in the first instance what happens when there is lesser participation. This is something that it doesn't matter what's going to happen next. Well, that's sort of interesting. That doesn't seem intuitive to me. I mean, if all these lawsuits that the states are bringing are going to end up losing, I mean, the idea that you can be here and be demanding emergency relief just because states have kicked up a lot of dust seems not the right answer to me. No, that's not right, Your Honor, because in this very unusual circumstance, under the statute as well as the EPA's choice of method, it is relevant to look back at what Your Honor has just termed kicking up dust. But it's not kicking up dust because, first of all, the legal flaws were quite obvious, and they were previewed by commenters, and then very shortly afterwards litigation, and then the states came around, all of which the EPA had an obligation to engage in rulemaking with its eyes wide open. Now, why that matters, I gave you two reasons, the unique statutory circumstance as well as the EPA's choice of method. The statute itself requires the EPA to look back to prior predicate rulemaking in order to assert its authority to have a federal plan. And necessarily baked into that is the fact that there may be judicial intervention, especially by the EPA's own doing. What do you think the EPA should have done? I mean, there are 23 states here. Was the EPA required to sort of consider every permutation, you know, if 22 states are in the plan, if 21 states are in the plan, if 13 states are in the plan, if five states are in the plan? Which states are they? One of my clerks who does math better than I do tells me that there are two to the 23rd power, which is like four million different permutations. What was the EPA supposed to do? Well, I'm not going to go as far as to say that the EPA had to do necessarily every possible permutation of two to the power of 23 minus one. I have to tell my clerk it's minus one. But plus one or minus one. What the EPA had to do as a first matter is acknowledge the problem. So we're very far from talking about the line drawing things that you're talking about. What the EPA had to do was consider whether under this method it would need to address contingencies. And we're familiar in other areas of law where, for example, in elections law where you run a number of simulations and decide, you know what, we have a critical mass of a particular solution. Let's apply that. Let's go ahead with that. Thank you. Justice Gorsuch. Justice Jackson. My understanding is that you actually asked the D.C. Circuit to delay Merritt's briefing in this case. And I think that's the opposite of what I would have expected if you were actually suffering irreparable harm. You know, if you're suffering, I would think you'd want the D.C. Circuit to be moving as quickly as possible. So can you speak to that? Yes, Your Honor. First, because of the posture that this case has gone on with respect to litigation, the fact that we can get an answer that stymies the irreparable harm that is currently ongoing right now is something that we came to this court seeking. No, but why did you come to us? You were already before the D.C. Circuit. And my question is, if you're suffering because you're spending money related to compliance with a rule that you're challenging, why didn't you ask the D.C. Circuit to move quickly in rendering its ruling agreeing with you that the rule is invalid? Well, Your Honor, I'm not going to get too far into some of the considerations that went into it. But the most important one is that we wanted a rule that affects the entire country to be addressed in the first instance as quickly as possible so that we can avoid the sorts of irreparable harm that we are currently suffering. Thank you. Thank you, Counsel. Thank you. Ms. Stetson? Mr. Chief Justice, and may it please the Court, EPA's authority under the Good Neighbor provision is limited to regulating estates and missions that contribute significantly to downwind nonattainment. If EPA is regulating beyond that authority, it is regulating beyond the statute. Ms. Sridharan has explained the deficiencies in a broken rule in which 90 percent of power plant emissions, 75 percent of total emissions, have been taken out of the plan. But the Court also asked whether the admissions controls in the rule are reasonable regardless of the number of states that are involved. The answer is no for three primary reasons. First, the rule selectively ignores EME Homer's cost-effectiveness framework. Second, the rule over-controls across a number of industries. And third, the rule imposes an impossible compliance timeline that will result in reliability issues across the country. I welcome the Court's questions. I think one of the concerns we have is that so much of this seems to depend on the interdependence of the 23 states and what happens if some of the states are excluded. So let me ask it in a different way. Could EPA have accomplished the exact same thing by regulating the states individually as opposed to as an interdependent group? It could not have accomplished the exact same thing, Justice Thomas, to the extent that it would have to show, when you say the exact same thing, that the outcome, the cost threshold and so forth, would be the same across 11 states. But to your question of Ms. Rudharan, I think the issue that you were looking for is evidence about what EPA did. And I want to point you to 88 Federal Register 36741. When the effects of these emissions reductions are assessed collectively across the hundreds of EGU and non-EGU industrial sources that are subject to this rule, the cumulative improvements in ozone levels at downwind receptors, while they may vary to some extent, are both measurable and meaningful. That is the best example of the collective question that EPA asked itself and answered. Now, Justice Sotomayor, you asked the question about cost and whether the obligations, for example, in Ohio would be the same. But I think the question here goes back to what this Court approved in EME Homer. It's not just a question about whether EPA can regulate something that is inexpensive, potentially inexpensive. It's not a question about whether EPA can regulate emissions. It's a question about whether EPA has appropriately calculated what it calls that me in the curve, the point where the emissions contribution to a downwind state is controlled at a reasonable cost level. So I think the exchange that you had with Ms. Rudharan about where that cost issue comes from has to do with the question about if you've got 23 states and all of their EGUs and all of the non-EGU sources that are linked into this rule all feeding into that cost question, what happens if you take out the states where maybe you can control those costs most cheaply and you're left with states that actually have much higher cost thresholds to impose on industries or on EGUs? That changes the cost calculus. It also changes, of course, the emissions calculus. And I want to point in particular... Is that in your brief? Yes, it is. Where is that? When we discuss the 23-state question, you can look at pages 11-13 of the Kinder Morgan brief. You can look at pages 18-20 and 4-9 of the reply, and all of those go to this question about that difference between 23 and 11. But I want to bring home the point with a couple quotes from the... I guess my reaction is a little bit the same as that I gave to Ms. Rudharan. This is at such a higher level of generality than you're making the same arguments now. Our briefs do not really address this very complicated cost argument. I think, Justice Kagan, the cost argument, while some of the metrics, I think, are complicated, things like ozone modeling and so forth, the bottom line is actually not that complicated. The bottom line is what EPA was supposed to do under the good neighbor provision was to figure out, as it said in EME Homer and as it said it was doing here, where is that cost threshold? That word cost threshold, if you go back and look at the rule in EME Homer, appears 185 times. But what the EPA did here, with respect to non-EGUs in particular, is to look at the question about average costs, which is a completely different issue. Average cost is just how much do these emissions control cost? Does that seem like a reasonable number? Okay, we'll apply them and see what emissions controls exist downwind. And I'll tell you the other thing... The only point I was making, and I don't want to push you too hard on this, because it's not your fault. This is coming in a weird posture. I don't even see the term cost threshold on these pages. I think the term cost threshold is in the EPA's brief. It's a fundamental question about the way that EME Homer exists. If you look at the Kinder Morgan brief, there's a separate discussion of cost that I think is particularly relevant to this. There are two different strands, I think, that we're chasing here. One of them has to do with the 23 versus 11 question. What happens when you take 12 states out? The other question has to do with how EPA went about calculating cost. And I think I was moving from that first question to the second. On that first question, this discussion that you're having now, I thought the broader point was EPA was told the SIP disapprovals were problematic and were going to be problematic and could be unlawful. And EPA responded, no, they're not. But even if they are, we don't care. It's severable. That's a fine response if they then go on and explain why it still works if it's severable. But that's goose egg. They don't have an explanation there. It is a goose egg. Page 36693 of the Federal Register contains the entirety of what we'll call reasoning. So all this discussion about the cost threshold, that's what they should have explained if they're going to make the point, which is a big one. Hey, even if 12 states drop out, who cares, because it still works. Okay, show us how, to justify my words question, show us how it works. But that's their burden, I think, to show, to justify, to not be arbitrary and capricious. Yes, and in fact, if you look at that page that I just cited, 36693, what you'll see is it says should any jurisdiction-specific aspect of this rule be found invalid, the EPA views the rule as severable. Should any industry-specific rule be found invalid, the EPA views this rule as severable. This is not intended to be an exhaustive list. I'm sorry, whose burden? That may be their burden below. But the burden here, as I understand it, is on you to show this. And we go back to what Justice Kagan said. I read these applications pretty carefully, and I didn't understand this cost argument at all. And I'm really simplistic. I don't have a math degree. All right? If you're sharing cost among 23 people, your cost is going to be less. If you're sharing cost among 11 people, your cost is going to be more. So, since this plan doesn't change any allocations depending on the number of people who are in it, states are bound by the number that was calculated on the larger group. How are the remaining states affected by the fact that their cost should have been higher, but it's not? Because it's been fixed at this lower number. I'm very simplistic. You know, cost divided by 23 is always less than cost divided by 11 if your cost is going to stay constant. That's the question, though. And I think Justice Sotomayor- But does it matter? Meaning, if you're paying less on the wrong number because it was divided by 23, how could it be that on 11 your cost is ever going to be greater than that number? Justice Sotomayor, I think so much of it has to do with the states that would be in or out of that cost calculus. So, let's suppose, just to take your example- No, but my point is, once the states drop out, it doesn't matter what your responsibility is, because the cost is going to remain the same given the nature of this plan. They're not changing the cost once they've calculated the responsibility of the 23. If 12 are not paying it, what does it matter to you? I think that is the bug and not the feature of this plan. The cost was calculated where it was, because EPA looked at the aggregate cost of controls over that Federal Register site that I read you. Hundreds of EGUs across all of the states, hundreds of industries units across all of the states, it figured out what that aggregate cost was, and then it decided to allocate obligations. So, we keep talking about the end of that process, what obligations would change on a state based on taking everything out, but that's not the right place to put it. It seems to me that if the aggregate is contributing to something, and there's a certain amount of people who, for whatever legal reason, have been taken out of the calculus, why should you pay for them or not pay for them if the problem is a national one, really, not an individual one? I think, Justice Sotomayor, that that's actually EPA's argument, is that it makes sense to impose these emissions controls across these industries because it will result in what EPA calls meaningful reductions. Now, I'd encourage you to look at page 36743 and 36747 to figure out exactly the scope of those meaningful reductions of the 88 Federal Register Final Rule. What we're talking about when it comes to meaningful reductions is on the order of a total of 0.66 parts per billion averaged across all of these receptors. Now, there's a bigger number involved. That number is if you add all of the reductions from the receptors from Arizona to Connecticut, and you add them up, then you get a bigger parts per billion number. But that's like ticketing me for speeding if I exceed the speed limit one mile per hour in 23 different states. I'm sorry. I wanted to talk about a different kind of cost. I just want to talk about the cost that you have incurred thus far because the rule has been in effect, right? And part of your argument for emergency relief is the crushing cost and the risk of energy disruption, et cetera. What has been happening so far? Justice Barrett, the industries that I represent have been incurring costs to try to start permitting, compliance, all sorts of issues involving the run-up to installation of these controls. But let me pause on this because I think it also responds to a question, Justice Kagan, that you asked, which is we don't need to show in this posture certworthiness, nor do we need to show, Justice Jackson, that this is an emergency. What we need to show is for a stay that we have a likelihood of success on the merits and irreparable harm. But you didn't detail that, that I recall. I mean, you've talked about projected injury, projected costs that you're going to incur, but presumably the rule has been in effect for a while. Why haven't you talked about that? I think you're kind of shifting gears now. I mean, have you incurred significant financial costs that are unreasonable? Have there been, Justice Jackson asked Ohio's council about whether there have been these kinds of disruptions to this point? So let me answer the cost question and the disruption question, if I can. The first on the cost is if you look at the declarants, particularly with respect to the pipelines, you'll find explanations about what costs they have to incur in the next 12 to 18 months in order to stay in compliance with this timeline that we have pointed out is completely unreliable, in addition to all of the other problems that we've talked about. But on the question of irreparable harm in another respect, what we are talking about is also the question of immediate reliability issues. And if you look at the Brown Declaration attached to the American Forest and Paper stay application, you'll find that in the summer of 2024, he anticipates significant reliability problems because of some immediate changes that need to be made to a particular plant that is a critical reliability component of that particular system. So the harms are immediate. Thank you. Yeah, I have a question. Why haven't you asked the D.C. Circuit to expedite their review? I mean, if you're suffering the harms that you're talking about and you're pending before that court, I guess I'm still confused as to why we are the ones who are being asked in the first instance to look at this. Justice Jackson, we did move for expedited briefing. We were not given a briefing schedule. I thought you moved for a delay in briefing until after this court had decided. We initially sought expedited briefing. We did not get the schedule we wished. After the court granted argument in late December, we asked for a delay in order to impose some order on the process between this court and that court. All right, well, let me ask you about your representation that you just have the sort of same ordinary stay burden in this situation. I mean, surely the Supreme Court's emergency docket is not a viable alternative for every party that believes they have a meritorious claim against the government and doesn't want to have to comply with a rule while they're challenging it. It seems to me that even just sort of irreparable harm, as we've defined it, is insufficient to have the Supreme Court acting as a first decider on the merits of an issue that hasn't been addressed by the lower courts. So can you help me to understand what the burden should be in this very unique situation? The burden should be exactly what this court described in the Ken v. Holder. But in the Ken v. Holder, was that a situation in which the lower court had not yet even ruled at all on the merits of the claim? It was a situation in which the order of an agency came up to this court in a posture of a stay motion. Actually, I think that court involved the standard to be applied. Right, but I want you to appreciate the distinction that I'm making. This is a situation in which you have filed a claim in a lower court, the D.C. Circuit has not even looked at it, and you're asking the Supreme Court to essentially give a preview of its view of the merits. And I think that's quite extraordinary, and I'm trying to understand whether the same burden should apply on an applicant in that situation, and one in which we at least have a lower court ruling that you could show us and say, these people have made a mistake. We don't have that here. Justice Jackson, what we have is an agency order in which we are saying this agency made a significant mistake. In fact, several of them that are fault lines throughout the agency order. That is exactly what was at issue in McKen. If you look at footnote one of McKen, what the court says there is a question about staying an administrative order is just like a question about staying a judicial opinion. You are staying the source of the authority to act, and so the court has an opportunity to consider it further. Thank you. Now, even if, if I could just finish. Yes. Even if there is some standard that applies in this circumstance, the fact that this is a national rule, or purported to be a national rule, and costs as much as it costs, billions of dollars in compliance over the next 12 months, I think is reason enough. Thank you, counsel. Thank you. Mr. Stewart. Thank you, Mr. Chief Justice, and may it please the court. I'd like to make three quick points at the outset. First, with respect to the interest of the state applicants, I think it's important to bear in mind that at this stage of the proceedings, there are a lot more states on our side than there are on theirs, and it's vital to bear in mind the equities of the downwind states, because that's the whole point of the good neighbor probation, the Clean Air Act, and the good neighbor plan that the EPA implemented. And when we think about the interests of the downwind states, it's natural to think first of their humanitarian interest in the health and well-being of their residents. But downwind states that are out of attainment also have a legal obligation to come into attainment by deadlines specified by the statute. And to stay the rule in its entirety based on some theoretical possibility that the contours of an 11-instate rule might have been somewhat different if EPA had anticipated all the stays would be terribly unfair to the downwind states. The second point is that in addition to the severability language that Justice Kavanaugh referred to, EPA in the preamble said that it was reserving judgment on whether several additional states should ultimately be included in the plan. It said that if any of the 23 states that were currently included devised compliant SIPs, they could be taken out of the federal plan. And so EPA anticipated from the outset that the plan was one whose geographic composition could change. And EPA devised the requirements for each state in order that they would be workable if a smaller or larger set of states were ultimately covered. And then the last thing I would say is it's true that the federal plan is not currently providing the air quality benefits that EPA had hoped because the stays of the SIP plan disapprovals mean it's only reducing emissions from 11 states rather than 23. But for those 11 states, the requirements that are imposed on sources are exactly the same as would have been imposed on sources in those 11 states if the full plan had been implemented. And that the applicants have suggested that it's possible that the benefits associated with those requirements might have been different if EPA had known that only 11 states would have been included. But there's no reason to think that that's so. As we look at it, the difference between 3 and 0 is the same as the difference between 10 and 7. If you think that the plan is only delivering 30% of the 11 states are only delivering 30% of the 11 states are only delivering 30% of the 11 states are delivering the same quantum of air quality benefit. I welcome the court's questions. Mr. Stewart, was there any weight put on the interdependence of the 23 states as far as the benefits of the plan and the cost to the individual states? I think when they refer to interdependence, they're referring to kind of three topics that were discussed in the preamble. The first was EPA took pains to point out that although it was engaging in a complicated inquiry to decide what emission controls could be cost effectively imposed on different types of industrial sources, in the end it was placing the same requirements on all of the covered states. That is, to do equity, it was saying that power plants in Indiana need to come up to the same standard as power plants in Texas. And so in that sense, the plan was interdependent in that EPA wanted the same restrictions to apply to sources in all states. Thank you. Just if I could interrupt, what's the smallest state among the 23? The smallest state in terms of emissions? I'm not sure. Well, assume it's the smallest state. Okay. Would you have undertaken this program if only that state was involved? If only the state was involved, we might have not have thought it was worth the trouble to undertake such a comprehensive inquiry. Now, if 22 of the states had submitted compliant plans and only one was left, EPA would still have had a statutory obligation to promulgate for that state a plan. Okay. It's hard to stop you sometimes. If the current plan with the current number of states involved regulates 11% of the EGU emissions that you anticipated with the 23 states, would you have gone ahead with that? Again, if there had been any states, even one, with noncompliant plans, EPA would not only have had the authority but a statutory obligation to promulgate a federal plan for that state and to promulgate a federal plan that it thought would ensure that sources within the state didn't contribute significantly to downwind nonattainment. And what I said earlier, maybe if it was only a smaller set of states involved, EPA would think as a matter of cost-benefit analysis, it's not worth doing the whole enormous inquiry. We can do a quicker inquiry. I got it. I got it. Okay. Now, if you prevail here, when will EPA address the question that's raised about whether or not the fact that it's a reduction in terms of the number affected and a reduction in the number of states, when will EPA sit down and address that and when will they give an explanation rather than the litigants here? I don't think that they have any plan to do that, first of all, because whatever they might have done if they had been studying only 11 states at the outset, now that they've done the whole analysis, there would be no reason for them not to use what they found in devising a plan. Well, it's something new that you only regulate 11%, and in terms of why it's necessary to look at this here, if you think it's an important question, it's because EPA will not look at it until after the hundreds of millions of dollars of costs are incurred. I think part of the reason that we won't look at it is that the ground is still shifting. That is, EPA back earlier in the year proposed to disapprove the plans of several additional states, which if that ultimately went forward as the final decision would result in the addition of those states to the plan. We had a ruling from the Tenth Circuit at the end of the day on Friday saying that that proceeding is being transferred to the D.C. Circuit, and that could result in Utah and Oklahoma being put back into the federal plan. So part of the reason it wouldn't make sense for EPA to do a sort of ground-up inquiry is that just as it was getting done with that, it might have a new geographic composition to deal with. But it could have, in response to the comments that said the SIP disapprovals were going to be problematic, EPA could have come back and said, well, if some of the states are knocked out, the requirements will still be the same even if there are only 15 states or even if there are only 10 states because, and kind of explained that reasoning. That is, as I understand it, absent, and the problem is we're not sure if the requirements would be the same with 11 states as with 23, and it's just not explained. I think the comments were raised at kind of a lower level of specificity than you might imagine. That is, there were comments to the effect that your federal plan is in trouble because valid SIP disapprovals are a conditioned precedent to the federal plan, and the SIP disapprovals were bad. And to a point, those commenters have been vindicated. That is, several states have obtained stays of their SIP disapprovals, and the SIP disapprovals are bad. When the EPA came back, EPA said severability. So EPA understood the comment. No, I think the comment... EPA understood the comment and came back and said, even if we have fewer states, we're going to plow ahead anyway, and then the question I think that's raised is why and how, and that's just kind of pretend nothing happened, just go ahead with the 11 states in this instance. I think EPA understood the comment to be, to the extent that your SIP disapprovals are challenged and either stayed or ultimately struck down, your federal plan will be less effective. I don't think any commenter was saying specifically, if some SIP disapprovals are stayed, the plan will become arbitrary and capricious as to the other states. The plan will become unworkable. The cost, the requirements might change, and when EPA comes back, it doesn't explain anything. I mean, we know that the requirements don't change. That is, EPA imposed equivalent requirements on different, on power plants, on steel industry sources, on pipeline engines. With respect to industrial facilities in the same source category that are located in different states, EPA imposed exactly the same requirements, and the requirements that are imposed on sources in Indiana and Ohio, West Virginia is out for now because they got to stay, but in Indiana and Ohio, they're exactly the same as they would have been under an 11-state plan. The only argument that the applicants have is that maybe imposition of those requirements on the same sources in the 11 states will produce lower air quality benefits downwind now that it's only the 11 states. Yes. Just a couple of simple questions. How often does EPA use a severability provision like this? My understanding is it's very rare, a handful of times in the last 10 or 15 years out of the thousands of rules it's promulgated. Is that right? I don't know how often they do it generally, but I do know that it's been a recurrent feature of these sorts of good neighbor plans. Am I right, though, that it's only a handful of times over the last 10 or 15 years? I would be surprised if it's only a handful, but I don't have information on it. I found an article that said between 2000 and 2014 it was seven times. Do you have any other information? I don't have any other evidence, but I think even with that... Okay. My other simple question is could EPA have done this on a state-by-state basis? I mean, when a SIFIS fails, the obligation statutorily is for EPA to come up with a federal plan. Was that an option that it considered? I mean, since they did do that, that is... They did a 23-state plan. They did a 23-state plan. I'm just asking, did they consider doing a state-by-state plan? Yes or no? Yes. Okay. And why didn't they do that? And they did it. All right. They imposed it. We're talking past each other. We have a 23-state plan that I understand has state-by-state. I get that. I'm just wondering, did they consider doing that without respect to the 23 states as a collective? I mean, if what you mean is did they consider issuing 23 different federal register notices? Yes. That is my question. They considered it. If they did not have an overall federal plan, the trading program for the power plants would be easier to administer. It would be easier for power plants to trade emission allowances with power plants. Got it. Thank you. Suppose they had done it state-by-state and had, let's take Ohio as an example, had done the cost-benefit analysis for Ohio separately and in isolation. Would the requirements that the state now faces be the same? I think there's every reason to think that there would be. I don't think I could say that 100 percent, but I think part of what is threatening about the applicant's position is that the applicants haven't made an attempt to offer a nuance showing along those lines. They haven't done their analysis and said, given where we are now, the following modifications of the plan would be appropriate. And what I understand you to be saying is that the math might turn out the same, but it wouldn't necessarily turn out the same. Is that basically what you're saying? Yes, that's right. And certainly what we have now is a closer approximation to what an 11-state plan would have looked like than zero is. And what the applicants are asking for is zero. And that isn't an option that EPA could have chosen as a matter of statute. EPA was obligated, as a matter of statute, to promulgate some plan for each of the states that it found had failed to devise compliance. The fact that severability — go ahead. It's a simple question. The severability rule in the D.C. Circuit, as I understand it, is that it's presumptive, right? It's not conclusive. There are circumstances where provisions are interrelated so that the presumption is overcome. Why wouldn't that be true here? Well, I think partly because the severability inquiry in the D.C. Circuit, as I understand it, has two prongs. The first is, did the agency intend the rule to be severable along particular lines? And second, if the agency intended it, can what remains function sensibly as its own rule? And here we know that EPA intended it to be severable. The other thing I would say about the possible rarity of expressed severability provisions is, it's been a recurrent feature of these plans that states would drop in and out. EPA might promulgate a revised good neighbor plan, and some of the states would be included in the revised plan, and some would stay in the original plan. So it was just understood as a feature of this type of rulemaking that when the composition of the plan changed, the requirements imposed on the remaining states would not change. EPA decided in this rulemaking to make that statement explicit, to say EPA regarded it as severable along geographic lines, and that at least pre-permitted any inquiry as to what EPA intended the rule to be. But that's always been understood to be the rule, even when EPA doesn't say that explicitly. So, Mr. Stewart, can I ask you just about their challenge, and I'm trying to understand it, because the rule was enacted originally with 23 states, and was there a challenge at that point about the number of states originally, when it first was enacted? There were challenges to the antecedent SIP disapprovals, and many of the states said we should not be under any good neighbor plan, or under any new good neighbor plan, because we are already doing enough to ensure that our sources don't contribute significantly. So there was a possibility they could be out. There was a possibility, and those comments and those challenges were really brought during the SIP disapproval process. They were not brought necessarily as challenges to the federal plan. The rule, and I guess I'm trying to understand the interaction between a challenge being brought when the rule is enacted, and subsequent developments, like judicial stays, and how we think about that in terms of the ground shifting, and whether they can even, it's even judicially cognizable in this way. Yes, you would think that once the rule is promulgated, once it's signed and finalized by the agency, that if subsequent events provide, somebody thinks provide good cause for EPA to reconsider what it's done, we think it's a requirement as a matter of justiciability that a petition for reconsideration. Right, because we ordinarily would say like the agency can't supplement its reasons after the fact. We look at the rule at the time it's enacted, and we determine whether or not there were promulgation problems, right? Exactly, and we think first, that's a solid basis for finding a claim to be non-justiciable. But even if the court doesn't agree with that, we think that the fact that it is a kind of based on subsequent events should inform your consideration of the merits. That is, it should be the burden of the applicants to say fairly precisely, here is why the diminution of geographic coverage logically warrants a change to the terms of the plan. Mr. Stewart, on that point, so as I understand it, EPA originally proposed a 23-state solution, got some comments back saying it's not going to be 23 states, it might be something less than that, came back with a severability provision that effectively says instead of one 23-state solution, we're going to have 23 solutions, and nobody got an opportunity to comment on that. And so part of the problem, it seems to me, all these discussions about what does it mean when we have this applied to individual states, some subset of 23, is because nobody got a chance to comment on that. Now, you might say it's a logical outgrowth, but it's a very different thing to say we have 23 plans as opposed to one plan, and all of these arguments, nobody had a chance to comment on. What do you say to that? I guess part of what I would say is what I referred to earlier as the historical or legal backdrop. That is, it had traditionally been the case that the geographic composition of these plans would change, some states would drop out, some states might be added, it was understood that a state could always get out of a federal plan. I'm going to push back on that just a little bit because originally it was a 23-state solution. Then you got comments that said, ah, some are going to fall out, and the response was a severability provision, as Justice Kavanaugh pointed out, without a whole lot of explanation, and nobody got a chance to comment. I mean, what do you say to that? Just to the point of the APA is all about an opportunity to be heard, and nobody got a chance to be heard on the possibility that you can apply this formula to one small state potentially, the same formula that was dependent upon an analysis of an aggregate of 23. I think I would say people had a chance to make comments to the effect of, if some states drop out, the plan will become arbitrary and capricious or will need to be rethought as to the remaining states. But nobody was making that comment. People were making the valid comment that for any particular state, the legitimacy of applying the FIP depended on a valid SIPP disapproval. They still could have filed a motion for reconsideration, correct? Yes. That's the avenue when you're not given an opportunity to publicly comment. And that would be the time at which you could say, at least for now, here is the class of states that are out. And so you, EPA, rather than comment on, as Justice Kagan was pointing out, what would happen in the possibly millions of permutations of some states being in or out, at that point they could have said to EPA, these are the specific states that are out. We don't think the plan makes sense as to the remaining states. Is there a motion for? I'm sorry. Go ahead. Could you succinctly state for me what are the common features in this plan to all 23 states? Because as I looked at the plan, certain states were exempted out because they were already meeting their emission control goals. Certain states, the EPA determined, would be out of it at a certain point in time, but not initially. So it was very individualized in many ways. So tell me what wasn't. Most of it, there were initial determinations about which states should be included. But with respect to the states that were included, the requirements were mostly uniform. That is, in 2024 and 2025, the plan would only impose new requirements on power plants, electric generating units. And for the most part during those years, those requirements would simply be that the power plants operate their existing controls to the maximum extent. Thank you, counsel. Justice Thomas? Well, just two very simple questions. Had there been a motion for reconsideration by the EPA, would there have been any deadline for the EPA to rule on that? There were two motions raising this issue. One was a motion for reconsideration filed by U.S. Steel, which raised this issue and also raised a pretty complicated set of technical challenges specific to the steel industry. And there was another file by AFPA, styled a motion to stay, that also raised the 11 versus 12. There is no deadline. There is a mechanism for arguing that EPA has unreasonably delayed, but that hasn't been invoked. Okay. The other question has to do with the fact that this is an emergency application. We now receive many applications for stays. Sometimes your office seeks a stay. Sometimes your office opposes a stay. What is your office's position on the question whether, in this context, what the stay applicant must show is some sort of super irreparable harm? Is the applicant required simply to show irreparable harm, or is it required to clear some much, much higher threshold? I don't think that there is any requirement that it clear a higher threshold, but I think just showing irreparable harm is not enough, particularly if there are countervailing harms on the other side. I understand that. And the other point I'd make about the stay they are seeking is that they really want a stay that will operate as a tolling principle. And by that I mean if the court issued a stay tomorrow and then two years went by and we in February of 2026, the usual consequence of vacating a stay would be that regulated parties would thereafter be subject to all the same legal requirements as they would have been if no stay had ever been issued. But that's not what they want. What they want is a rule that says if that happens, then all the compliance deadlines in 2026 and thereafter will be extended by two years in light of the fact that a stay had been effective in two years. And so that would delay the operation of the most stringent requirements to the detriment of the downwind states, even if it ultimately wins. Thank you, counsel. Justice O'Meara? Justice Kagan? I'm just wondering, Mr. Stewart, how often this kind of thing comes up. There are a lot of NACs, a lot of air pollutant standards, and presumably there's a kind of and then what SIPs need to change and if a FIP is necessary. And this seems like a pretty regular part of the EPA's business and maybe a regular part of the D.C. Circuit's business, because that's true. And I'm wondering if you would just say, is there something unusual about this case? I mean, one of the ways in which this case is very different from EME Homer is that in there was a pattern of EPA rejecting 20-some state plans and then implementing a federal plan. And there were a very wide array of challenges to the federal plan in EME Homer. They went through the D.C. Circuit. They got up to this court. There was very little litigation about the antecedent SIP disapprovals. And so I think that's one of the unusual features of this case in comparison to prior cases involving good neighbor plans. So there hasn't been other circumstances in which this exact question has come up? Right. I think in the EME Homer context, there were three challenges to SIP disapprovals, and I don't know that any of them were ultimately resolved on the merits. And so there wasn't this situation where preliminary orders entered in the SIP disapproval litigation caused people to argue about, is the plan still rational as to the states that remain? And do you know what the D.C. Circuit intends to do? Or do you have a guess as to what the D.C. Circuit will do with respect to the interaction between the SIP litigations that are happening across the country and the question before it? I don't have a clear sense of what they will do, and I think it will depend in part on how do the SIP litigation lawsuits progress while the D.C. Circuit is considering the case? That is, by the time that the D.C. Circuit is ultimately ready to issue a decision, we may have some or all of the SIP disapproval lawsuits resolved one way or the other, either in EPA's favor, in which there are more states back in the plan, or if they're resolved against EPA, then the D.C. Circuit can kind of take it as given that those states are out for the time being and can consider arguments about what the consequences should be. Thank you. Justice Gorsuch? Justice Kavanaugh? If 11 states rather than 23 were involved, does that affect the trading program? It will affect it to the extent that there will be fewer potential trading partners. We have a declaration from Mr. Goffman in our appendix that says the trading program can still work robustly. It doesn't depend on the full 23 states being involved. We've certainly had plenty of trading programs in the past. What does robustly mean? I don't know if he used the term robustly, but I think what he meant is it is still a real and viable opportunity. He said the price of allowances has not gone up. And I guess the only other thing I would say about the trading program is it would be absurd to think that if EPA had known there would only be an 11-state trading program, it wouldn't have regulated EGUs at all. Certainly EPA would have regulated them. I don't think that's the suggestion. But can I ask you a question about maybe following up on Justice Alito's questions and some of the more general questions that have been raised earlier about the standard, what we're doing here. On an emergency stay, one of the factors is irreparable harm. I'm just giving you my view. Both sides have irreparable harm. So that's a wash. The public interest, both sides have a strong public interest in my view. So then the only other factor on which we can decide this under our traditional standard is likelihood of success on the merits. In my view, that accounts for cert-worthiness, but this is the kind of issue that would be cert-worthy ultimately, so check for me on that one. Then it comes down to likelihood of success on the merits. We can't do that without looking at the merits, right? I guess the two things I'd say in response to that, can I get a yes or no on that? Can we determine likelihood of success on the merits without at least taking a look and making some assessment as best we can of the merits? I agree with that. The two things I would say are, first, in determining likelihood of ultimate success on the merits, the court would not only have to kind of reach its own judgment about is it arbitrary or not to have the current 11 versus 12 state disparity, it would also have to make some predictive judgment about whether that 11 versus 12 state disparity is going to continue into the future, and that would just require- Right. Do you think we make a better assessment after an oral argument than we do without an oral argument? I hope so. Exactly. And then the other thing I would say, to your point about irreparable harm, I think it is the case that both sides have shown some irreparable harm. I don't agree with the idea that if they've both shown irreparable harm, it's a wash, because I think particularly taking into account the equities of the downwind states- I agree with you about the equities of the downwind states, but there's also the equities of the upwind states and the industry, and I don't know how, and they're both major. And so we have to figure out what to do in the interim. You said two years between now and 2026. That's what we have to figure out. Should these costs be incurred for the next two years with the benefits to the downwind states, or should these costs not be incurred with the detriments to the downwind states? And the only way under our usual standard to figure that out, as I see it, is to make the best evaluation we can, and it's not easy, which is why we're here, in my view, of likelihood of success on the merits. And I guess the only further point, or maybe it's a recapitulation of my point about likelihood of success, is the applicants have offered speculation that the plan might have been different in some respects if it had been devised as an 11-state plan, but they haven't identified any concrete modification that they've- Well, I think, right, and this turns on, okay, on the merits, they're arguing it's arbitrary and capricious, and one of the classic arbitrary and capricious conclusions is a failure to explain. It's not reasonable and reasonably explained. And one of the complaints they have, which we have to evaluate, is whether they're likely to succeed in saying that the rule, as was not adequately explained, in considering the possibility that the SIPTF's approvals would be validated or stayed in the states and would drop out a number of states. We have to evaluate that, correct? We have to evaluate that. But to the extent that what they are saying is EPA behaved arbitrarily in not reconsidering its judgment afterwards in light of the fact that 12 states had been taken out, that's a different inquiry. And have I missed any of the factors that we should be considering in evaluating an application for a state? No, it just- In terms of- That's all I have for you. Okay. Justice Barrett? Mr. Stewart, I want to ask you about certworthiness. So Justice Kavanaugh just pointed out that certworthiness can be considered part of assessing likelihood of success on the merits. I just want to be sure I understand what the position of the Solicitor General's Office is on that. In this posture, applicants say certworthiness should not be a factor, that M-10 standards should just apply without respect to certworthiness. What is the Solicitor General's position? I think it's our view that you should consider certworthiness in a sense as part of the likelihood of- As Justice Kavanaugh framed it. Yes. And the idea is if likelihood of success means likelihood of success in this court, then that has to be not just would the court rule in their favor if it took the case, but what's the chance that the court would take the case? If you think that likelihood of success is a predictive judgment about what the D.C. Circuit will- Would you urge us to take this case? I mean, it depends on what came out of it. Obviously, we would- So do you think the case is certworthy? Not in its current posture, but we don't know what the D.C. Circuit is going to do. It's certainly possible that the D.C. Circuit will issue a ruling for or against us that would raise issues of overarching importance, and so the calculus would change then. We don't think that the question, was EPA required to put the rule on hold and impose no restrictions while it considered what changes might be warranted in light of reduced geographic coverage. We don't think that question is certain. And do you agree, just as Kagan pointed out, some of the stuff or the vehicle problems that might be attended in this application, do you agree that those are factors that we should consider in assessing certworthiness in this posture? Yes, because as I say, part of the presentation and oral argument was to the effect that the cost-effectiveness calculus might have been different if EPA had only had 11 states in mind, and to the extent that's an empirical judgment, that's just going through the scientific evidence. That doesn't seem like something that would ordinarily be a Supreme Court case. Thank you. Justice Jackson? Yes, I guess I don't understand why the usual traditional standard could possibly suffice in this situation. I mean, Justice Barrett and Justice Kagan suggested certworthiness as another consideration, but don't we have to have something so that we, the Supreme Court, is not supplanting the entirety of the lower federal court system when we're looking at cases of this nature? Yes, and I mean, it may be that kind of the very unpredictability of what will happen in the D.C. Circuit leads to unpredictability about whether this will ultimately be a certworthy case, and so it may be that- So certworthiness could be another way of saying it. I mean, I prefer to think about whether or not there's something extraordinarily harmful going on in the situation that would warrant in this situation, in this case, the Supreme Court acting as the first decider of the merits of an issue like this. I mean, that seems to me to be truly extraordinary, and if we are going to entertain every motion that someone has about being harmed or whatnot in the lower courts before any of the lower courts even get the opportunity to talk about it, I feel like we have to have something that guides our consideration of when to do that. We would agree with that, and we would just add the point that this is not just a case where the other side needs to make an extraordinary showing. It is a case where if a stay is entered and the government ultimately prevails on the merits, we in the downwind states will suffer a very high, high degree of continuing harm even after the stay is vacated. Thank you. Thank you, Counsel. Mr. Chief Justice, and may it please the Court, in the Good Neighbor provision, Congress protected downwind states from pollution emitted in upwind states. A stay of the Good Neighbor rule would undermine that statutory goal and the public interest by sending ozone pollution into downwind states, including Connecticut, Wisconsin, and New York, that receive substantial pollution from the particular upwind states that are currently in the rule, including Ohio and Indiana. The harms from a stay will flow to both the residents of downwind states who will experience health dangers and to downwind industry, which pays increased costs to compensate for upwind pollution and comply with the current more stringent standard. For example, Connecticut sources currently pay up to $13,000 per ton of ozone precursor reduced, while in the near term, for PowerPoint plans under this rule, just to turn on controls costs about $1,600 per ton. By contrast, and that's why applying the rule to the upwind states is relatively less expensive and harmful. I welcome the Court's questions. How do you arrive at that conclusion that it's less expensive for the upwind states? It comes from, I think, two things, one on either side of the balance. For the upwind states, the rules design, the way it defines significant contribution, is for sources to do the relatively less expensive controls. I understand that there are still costs, but they are relatively less expensive because it's based on having upwind states do controls that downwind sources and many other sources across the country have already done. For example, like turning on pollution controls on power plants that are already installed. That's the lowest of the low-hanging fruit. By contrast, downwind sources, as they get the upwind pollution, they have to compensate for it, but they've already exhausted a lot of the less expensive strategies. So they need to turn to more and more expensive strategies to find any further cuts. And one of the reasons why sources have exhausted their less expensive options is because of the statutory consequences of nonattainment. So in Section 7511, I believe, little a, it is the Clean Air Act that puts on more and more stringent requirements onto downwind sources as states move into worse and worse levels of nonattainment. So more and more sources need to put on controls, smaller and smaller sources need to put on controls, and the controls themselves get more stringent. And I think that's how we get into this situation for the downwind sources. And the rule right now continues to provide substantial and meaningful benefits to the downwind sources. It is not a shell or a disaster. And that's because upwind pollution is not evenly distributed as it goes downwind. So the downwind states that generally get a lot of pollution from the 11 states in the rule now still stand to get a lot of benefits. So, for example, in Wisconsin, the areas that struggle with air quality get approximately 40% of their ozone from the 11 states currently in the rule, 13% from Indiana alone. And for Connecticut, the current scope of the rule gets it 65% of the emission reduction compared to the full scope of the rule. And that relief for downwind states is also urgent because of the way nonattainment works. Nonattainment, those deadlines keep on coming, regardless of whether good neighbor obligations are fulfilled, even though the deadlines, as the D.C. Circuit has made clear, are supposed to be aligned. What they're asking for is simply an opportunity to make the argument before the agency. And as I understand it, the burden on the agency is simply to provide a rational or reasonable explanation. So you're making arguments on the merits. We don't have those arguments made or substantiated on the record by the EPA. Well, I think the path that Congress laid out for raising these arguments when they arose after the end of the comment period is the petition for reconsideration. A lot of the cost analysis that I'm giving you was considered by EPA. That's part of the rule. I mean, part of the whole idea of the rule is that upwind states and upwind sources, really, that each source needs to do its own significant contributions of pollution, needs to take care of its own. And that's defined by what each source can do using certain controls. It's not defined based on some magic number of emissions reductions from 23 states. And I think we have every reason to believe that the cost threshold and the controls that went into the stringencies would be exactly the same, no matter whether it was 23 or 11 or 5 states, because most of these controls are well-established. They've been around for over 25 years. And downwind sources are already using them to try to reduce their emissions. So the rule is trying to get the upwind sources not to do technical innovation or newfangled things, but to get them into the middle of the pack that downwind sources are already doing. Suppose that one of the states that is still subject to this requirement is paying too much, more than it would have paid if the plan had been calculated based on that state situation alone or based on just the states that remain subject to the requirement at this time. I just want to make sure I understand your argument, the argument that you began with. Was it your argument that even if that is true, the detriment to New York would be enough to outweigh the fact that that state or those remaining states are paying what we might say simply, in simple terms, too much? Was that your argument? That is part of the argument, yes. Yes, because it's looking at, and I think what should drive the court's analysis in this unusual stay posture, what should inform it, is the statute. And the statute has already done a little bit of this weighing of the interest between states. And it's highly protective. The point of the statute is to protect downwind states, not just their residents, of course that's important, but also downwind industry from the free-riding of upwind states. Well, that might be true, but does that answer the argument that the EPA should have considered the argument that you just made? Did it do that? Yes. Yes, EPA did consider that. That is part of the fundamental idea of how significant contributions of pollution is defined. The point of it is to say, let's get the upwind sources doing the relatively less expensive controls that many downwind sources and sources all around the country are already doing. So that was fundamental to the rule. And I think it is also a fundamental understanding of the rule that states can come in and out. We have had experience with this under many prior ozone transport rules. They were all done in this sort of multi-state way. I do think EPA could have written 23 different Federal Register notices, but that seems like We have had states drop out. We have had one state, Georgia, remaining in a trading program by itself. And if I could just maybe explain why the trading program is not interdependent in the sense that I think applicants are making it. Two things there. First of all, as states drop out, supply and demand are going down roughly even. So while there are fewer allowances, there are also fewer market participants asking for Second, the states are not the market participants. We are not left with 10 market participants. It is the power plants that are the market participants. There are currently about 360 market participants in the trading program. That's why we have the declarations. That's the reason why the declarations are all able to say, look, it's working robustly. You say, what, it's not essential that they are interdependent? Well, what they said in the rule was that they were measurable and meaningful cumulative improvements in ozone levels at downwind receptors when the effects of the emissions reductions are assessed collectively across the hundreds of EGU and non-EGU sources. So there in the rule what they said is you look at it cumulatively and collectively. Well, that is one piece of the Step 3 analysis, and I think what EPA is saying there is that, yes, they do look when they are doing the rule, is this going to have a meaningful effect? You don't want to do a rule that turns out it's not doing anything. Then EPA will probably have to go back to the drawing board and make it more stringent in order to have a meaningful effect. But ultimately, we know that we continue to have a meaningful effect because the costs and the emission reduction benefits that come out of Ohio and Indiana and all of the states still in the rule remain exactly the same, no matter whether there's 23 states or 10. I don't know. I don't know. Would you have thought it cert-worthy? Perhaps. I would have thought either way somebody is going to think this is cert-worthy. But I think it's the applicant's burden here. Of course. But you would have borne that burden the other way around, and this is a really important thing to both sides. I understand that, but I think that the issue here that they are raising in this stay posture is this EPA should have considered after arising events that are still changing today. So I don't think that is right. And it just would have been your burden rather than theirs. Correct. Okay. Thank you. Thank you, counsel. Justice Thomas, anything further? Justice Aliyah? Justice Sotomayor? So you could have both lost. Justice Kagan, anything further? Justice Jackson? Okay. Thank you, counsel. Ms. Stetson, rebuttal? Three quick points, Your Honors. First, on emissions. Second, on the other fault lines in the rule that I mentioned. And the third, on equities. The first is, what you heard Ms. Vail just say is that the purpose of the good neighbor provision is to protect downwind states from emissions of upwind states. No. The purpose of the good neighbor provision is to reduce the significant contribution that upwind states make to downwind states. And that's why 11, Chief Justice Roberts, versus 23 matters. That question about how many is a collective, how many hundreds of EGUs, how many hundreds of non-EGUs that are being regulated here for the first time, by the way. How many of those feed into the analysis is exactly the problem. We didn't have to seek reconsideration, Justice Gorsuch, on the question about whether EPA had significantly explained itself. We raised the issue. We sought reconsideration, in fact. EPA still hasn't acted on reconsideration, which you can see in Note 9 of the Goffman Declaration. We had no obligation to do anything more than that. It was clear in the rule, as evidenced by the fact that EPA put in a severability provision announcing its intention that something be severable. Not an explanation, but an intention. If there are 11 states in this rule, the answer to your question, Mr. Chief Justice, is that EPA would have had to ask whether or not there still would be a significant contribution, not just an air quality benefit downwind, but a significant contribution given the costs on the industries and power plants in those states. The fault lines throughout the rule I've already mentioned. I mentioned in the opening. It goes to your court's second question. There are over-control issues here in addition to the reliability issues that were ignored by EPA. And the last thing I'd say is on the equities. The equities are not balanced, Justice Kavanaugh. The equities here are there are hundreds of millions, if not billions, of dollars in costs over the next 12 to 18 months, coupled against 10% of the .66 average part per billion contribution. This is not a very, very significant downwind problem. This is a minuscule problem. Thank you. Thank you, counsel. The case is submitted.